UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

COMMUNITY HEALTH
CENTERS, INC.,

    Plaintiff,

v.                                Case No. 6:23-cv-2426-JA-EJK

DIAMONDDOG SERVICES, INC.
and DIAMONDDOG
MARKETING, LLC,

    Defendants.
_____

## ORDER

Plaintiff Community Health Centers, Inc. (CHC) has sued Defendants DiamondDog Services, Inc. and DiamondDog Marketing, LLC (collectively DiamondDog). CHC's three-count complaint alleges common law copyright infringement (Count I) and violations of the Digital Millenium Copyright Act (DMCA)[1] (Count II) and the Florida Deceptive and Unfair Trade Practices Act (FDUTPA)[2] (Count III). (*Id.* ¶¶ 20–37). DiamondDog now seeks dismissal of all three counts under Rule 12(b)(6). (*See* Doc. 10). Having reviewed the parties' submissions, the Court finds that the motion must be granted in part and denied in part.

---

[1] *See* 17 U.S.C. §§ 1202 & 1203.
[2] Fla. Stat. §§ 501.201–.213.

I.  **BACKGROUND**[3]

CHC is principally located in Winter Garden, Florida, and is "one of [Central Florida]'s larger not-for-profit providers of health and wellness services." (Doc. 1 ¶ 6). The DiamondDog entities are Georgia companies specializing in "website design and marketing." (*Id.* ¶ 7). Coastal Community Health Services (Coastal)—not related to CHC—is a healthcare provider located in Georgia. (*Id.* ¶ 4).

Around December 2020 or January 2021, CHC decided a new website would further its healthcare mission. (*Id.* ¶ 8). After learning how much it would cost to have a third party create a website, CHC decided to create one in-house. (*Id.* ¶¶ 9–10). "After seven months of work, including multiple draft websites that were not published," CHC's new website "went live on or about July 26, 2021." (*Id.* ¶ 12). The website was so well done that it attracted the attention of healthcare providers around the country, including Coastal, who wanted similar sites for themselves. (*See id.* ¶¶ 13–14).

On February 16, 2022, Coastal's chief executive officer contacted the CHC employees who designed the CHC website and asked if Coastal could buy the site. (*Id.* ¶ 13). The CHC designers responded that "the website was not for sale." (*Id.*). The Coastal CEO then asked if the designers could sell Coastal the website

---

[3] The Court accepts as true the well-pleaded facts in the complaint (Doc. 1). *See Redland Co. v. Bank of Am. Corp.*, 568 F.3d 1232, 1234 (11th Cir. 2009).

2

without CHC's knowledge, and the designers responded that such conduct "would be unethical" because "the website belonged to CHC." (*Id.*). Sometime after this conversation, Coastal contracted with DiamondDog to create a website. (*Id.* ¶ 15). DiamondDog later delivered a website to Coastal "that expressly copied" CHC's site. (*Id.* ¶ 16). In doing so, DiamondDog used "text content created uniquely for" CHC and "copied actual programming code with a unique instruction." (*Id.*). DiamondDog did not acknowledge CHC's copyright in the design of the website. In fact, a "2022 version of Coastal's website removed the copyright notice at the bottom of CHC's website ('Copyright © 2022 Community Health Centers, Inc. All Rights Reserved.') and replaced it with a copyright notice in Coastal's name ('Copyright 2022 Coastal Community Health Designed and Powered by [D]iamond[D]og Strategic Marketing Services.')." (*Id.* ¶ 18).

Later, the CHC designers accessed Coastal's website and "immediately recognized their work as having been taken without permission, edited slightly, and published on the internet as Coastal's own website." (*Id.* ¶ 17). CHC sent cease-and-desist requests to DiamondDog and Coastal, but these requests were rejected. (*Id.* ¶ 19). As a result, CHC continues to suffer damages, (*id.*), namely "the loss of potential licensing revenue for [CHC's] unique website and the inherent unfairness in passing off CHC's unique and expensive creation as Diamond[D]og's own," (*id.* ¶ 36; *accord id.* ¶ 24 ("lost profits from licensing the

3

website[] and from reaping the benefit of CHC's seven months of creation and innovation without paying for said benefit'")).

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the plaintiff alleges enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Merely reciting the elements of a claim is not enough, and courts need not accept legal conclusions that lack sufficient factual support. *Id.* However, courts must accept as true a complaint's well-pleaded factual allegations and "construe them in the light most favorable to the plaintiff." *Redland Co. v. Bank of Am. Corp.*, 568 F.3d 1232, 1234 (11th Cir. 2009).

## III. DISCUSSION

CHC consents to the dismissal of Count I on grounds related to preemption and federal copyright registration and states that CHC has applied for the registration and "will seek leave to amend the Complaint if and when its copyright is federally registered." (Doc. 11 at 3). Similarly, CHC responds to DiamondDog's argument that Count III should be dismissed for lack of actual damages, (*see* Doc. 10 at 13–14), by "ask[ing] for leave to amend Count III to add additional facts to make clear the existence of such damages." (Doc. 11 at 8). *See*

4

*Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019) ("[Business] entities frequently do not suffer actual damages from unfair and deceptive practices of competitors. Instead, their damages are frequently special or consequential damages, and thus, not compensable under [FDUTPA].").[4] Based on CHC's response, the Court will dismiss Counts I and III without prejudice and allow CHC to file an amended complaint.[5] That just leaves Count II.

The DMCA prohibits knowingly providing or distributing false copyright management information "with the intent to induce, enable, facilitate, or conceal [copyright] infringement," 17 U.S.C. § 1202(a), or "intentionally remov[ing] or alter[ing] any copyright management information" "without the authority of the copyright owner or the law" when there are "reasonable grounds to know" that the removal or alteration "will induce, enable, facilitate, or conceal an infringement of any right under" federal copyright law, *id.* § 1202(b)(1). And

---

[4] "[A]bsent a decision from the state supreme court on an issue of state law, [Eleventh Circuit courts] are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently." *McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002).

[5] Given CHC's agreement to dismiss Count I, the Court does not reach DiamondDog's arguments about that count. Nor does the Court reach the arguments related to Count III except to note that CHC must plausibly plead actual damages to recover under FDUTPA. *See Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023) (listing actual damages as an element of a FDUTPA claim and explaining that although a plaintiff does not need to "be a consumer to assert a FDUTPA claim," the plaintiff does need to establish consumer injury).

the DMCA allows "[a]ny person injured by a violation of" these prohibitions to "bring a civil action" for damages. *Id.* § 1203(a).

DiamondDog maintains that Count II does not plausibly allege that DiamondDog removed or altered CHC's copyright management information when it created Coastal's website or that it had the requisite intent when it removed or altered the information. (Doc. 10 at 11–13). The Court disagrees. Count II does not allege that DiamondDog created Coastal's website; rather, the count claims that DiamondDog "expressly copied" CHC's website—using unique text content, programming code, and more—and passed off "a marginally modified version of" CHC's site "as its own creation" in its dealings with Coastal. (Doc. 1 ¶¶ 4, 16, 25). Count II asserts that in removing the 2022 copyright notice in CHC's name from the website and replacing it with a notice in Coastal's name, DiamondDog provided false copyright management information indicating Coastal's ownership of CHC's work and distributed that false information online. (*Id.* ¶¶ 18, 25, 27–30). Although Count II is somewhat conclusory in stating that DiamondDog acted "for the express purposes of inducing, enabling, facilitating, or concealing" its infringement of CHC's copyright, (*id.* ¶ 31), the Court agrees with CHC that "it is fair to infer that when [DiamondDog] delivered a copied website to a customer in the exact same industry as [CHC] and removed [CHC]'s copyright management information and replaced it with the customer's, . . . [DiamondDog's] purposes . . . , at the

very least," included concealment, (Doc. 11 at 7). Thus, Count II plausibly pleads DMCA claims.

## IV. CONCLUSION

In light of the above, it is **ORDERED** that the motion to dismiss (Doc. 10) is **GRANTED in part and DENIED in part**. Counts I and III are **DISMISSED without prejudice**. The motion is otherwise **denied. No later than April 24, 2024**, CHC may file an amended complaint consistent with this Order.

**DONE** and **ORDERED** in Orlando, Florida, on April 11, 2024.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record